(C. D. 1753)

GOLD-SILVER & CO. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided January 19, 1956)

*Barnes, Richardson & Colburn (Edward N. Glad* of counsel) for the plaintiff.
*Warren E. Burger,* Assistant Attorney General (*Joseph E. Weil* and *William J. Vitale,* trial attorneys), for the defendant.

Before EKWALL and JOHNSON, Judges

JOHNSON, Judge: This case involves merchandise imported from Japan on or about August 19, 1952, by Gold-Silver & Co., the plaintiff herein. It was described on the invoice as toy blank cartridges and was assessed with duty by the collector at 30 per centum ad valorem under paragraph 1517 of the Tariff Act of 1930 as blank cartridges. Said merchandise was entered as percussion caps, and it is claimed that it is properly dutiable, as such, at 15 per centum ad valorem under paragraph 1517, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T. D. 52739.

The pertinent provisions of the tariff act are as follows:

PAR. 1517. Percussion caps, cartridges, and cartridge shells empty, 30 per centum ad valorem; * * *.

Par. 1517 [as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T. D. 52739]. Percussion caps, 15% ad val.

At the trial, David Silver, called as a witness for the plaintiff, testified that he is president of G & S Manufacturing Co. and of Gold-Silver & Co., the latter being a subsidiary of the former. He said also that the business, now known as Gold-Silver & Co., is a newly formed corporation and that G & S Manufacturing Co. is a continuation of the original Gold-Silver & Co., which, in 1945 or 1946, started importing watches, watch movements, watch parts, and various specialty items.

The witness stated that he was familiar with the merchandise involved herein and that he personally ordered it. A sample was received in evidence and marked plaintiff's exhibit 1. It consists of a capsule containing a number of tiny articles. Each article is a metal tube or cylinder, about three-sixteenths of an inch long and one-sixteenth of an inch in diameter. It is closed at one end and appears to contain some material filling it about halfway. A metallic pin has been inserted into the side of the cylinder near the closed end.

The witness stated that the merchandise is used in firing a miniature pistol. Such a miniature pistol, about 1⅝ inches long, was received in evidence as plaintiff's illustrative exhibit 2. To demonstrate the use of the imported merchandise, the witness cocked the hammer of the pistol, lowered the barrel, and inserted one of the cylinders in the barrel, with the little pin going into a slot on the top of the barrel. The barrel was then returned to firing position and the pistol fired. When the witness pulled the trigger, the hammer made contact with the pin, and flame came out of the muzzle. The casing was then removed from the barrel by means of a small ramrod. The shell was marked in evidence as plaintiff's illustrative exhibit 3. It is empty and has been split on one side. Another split appears where the little pin pierces the cylinder, and the pin itself is at more of an angle than in the articles in plaintiff's exhibit 1.

The witness Silver stated that he had ordered an explosive mixture, consisting of 0.002 gram of potassium chlorate and 0.002 gram of sulfide of antimony, to be placed in the articles. He sold them as "caps."

A report of a chemical analysis of the material in the article, made by the United States Customs Laboratory, describes it as a black explosive powder consisting essentially of a mixture of potassium chlorate and antimony sulfide. (Plaintiff's exhibit 5.)

Plaintiff's second witness was Joseph Boyd Williams, who described his experience in the field of firearms and ballistics as follows: From 1916 to 1917, he gave instructions in firearms to Army camps and built the first ordnance truck the Army had on the Mexican border. He joined the Marines as a machine-gun instructor at Quantico, Va.,

and went overseas with them in World War I. Thereafter, he spent 4 years on the police force in Los Angeles, was criminal investigator for the district attorney general in Nashville, Tenn., and served as chief of the state police on two different occasions. In World War II, he was with the Army Air Force Intelligence. After the war, he was with the war trials in Japan for 1 year and trained Japanese police for 3 years. At the present time, he operates a private bureau, having previously set up the state C. I., Bureau of Investigation. During all that time, he worked with ballistics, guns, laboratory equipment, and ammunition, including cartridges and percussion caps.

This witness described cartridges and percussion caps and their uses as follows: All cartridges, including blanks, contain gunpowder. In addition, they have to have primers or percussion caps. The purpose in using a cartridge is to fire a projectile, such as a bullet, from a pistol or shotgun. This is done by means of the powder charge. When the powder burns, it creates a gas, which burns so fast that the resulting pressure projects the bullet out. Gunpowder cannot be ignited by striking it violently; it must be ignited by a spark. For this purpose, a primer or percussion cap must be used. That article is a little brass cup that is placed in the center of a pistol cartridge or shotgun shell. It does not contain gunpowder, but a fulminating powder, such as potassium chlorate, sulfide of antimony, fulminate of mercury, or other compound. When the firing pin hits the little anvil, which is inside the primer or percussion cap, the friction causes a spark, and fire is flashed through a little hole in the primer into the gunpowder or other propellant charge in the cartridge.

Blank cartridges contain a fast-burning powder, because they have no compression but only a paper wad [not a projectile] to keep the powder in. When such a cartridge is fired, gas which pushes out is created.

The witness had never seen a cartridge containing anything but gunpowder (black or smokeless powder). He stated: "Black powder is composed of saltpeter, charcoal, and sulphur, and your gunpowder is composed of nitric acid on cotton and glycerin, and compositions of that nature." [1] A blank cartridge filled with potassium chlorate and sulfide of antimony would blow the gun barrel to pieces. Such a charge would be too strong, too powerful.

In the opinion of the witness, based upon his experience, the imported merchandise consists of percussion caps. He reached this

---

[1] Black powder has been defined as a mechanical mixture of potassium or sodium nitrate, charcoal, and sulfur. It has been known for at least 700 years and, with the development of the gun, became the universal explosive. Today, smokeless powders, consisting of colloided nitrocellulose, as such, or mixed with nitroglycerin or other materials, are used. [Encyclopedia of Chemical Technology, vol. 6, pp. 3, 77-78.]

conclusion because of the way the item is made and because powder could not be set off by hitting the little pin that goes into the copper cup. Therefore, he said, the material must be potassium chlorate or fulminate of mercury or some composition like that.

The witness had seen articles similar to the imported merchandise used in oldtime muzzle-loaded shotguns. In those, the percussion cap is on the outside and, when the hammer hits, a spark goes down through the hole and sets the powder off. All muzzle-loaded guns and oldtime Colt revolvers employed percussion caps and shot off projectiles. The witness did not know of any modern gun that employed a percussion cap.

The witness stated that a toothpick or pin could be shot from the miniature pistol if a percussion cap were used, since some pressure would be generated. He thought it would go 12 or 15 inches, but not through even a piece of paper because there would not be enough pressure. He explained that, in shooting a projectile, it is necessary to have a bullet that is airtight to build up pressure, whereas with a pin or toothpick the pressure would go all around it.

Defendant called Coleman C. Jones, a captain in the United States Marines, who has become familiar with ammunition, cartridges, percussion caps, and ballistics through instruction, training, and experience in the Marines for about 19 years. His testimony may be summarized as follows:

The cartridge serves the purpose of propelling a projectile to a target. It contains a primer, gunpowder or some other propellant charge of low-grade powder, and a projectile. The primer or percussion cap contains a high-grade powder which can be ignited by a violent blow or by the use of friction. The propellant charge is ignited by a flash or explosion from the primer. As the propellant charge burns, gases are formed behind the projectile and push it out of the muzzle of the gun.

A blank cartridge does not contain a projectile, but does contain a low-grade powder and a percussion cap with fulminating powder. The witness never saw a blank cartridge containing only potassium chlorate and sulfide of antimony or other fulminating powder. If a .22-caliber blank cartridge filled with fulminating powder were placed in a rifle and fired, the weapon might be destroyed because the force would be too great.

A percussion cap or primer is used normally to set off a propellant charge. Percussion caps are used with dynamite or in hand grenades or other explosives to set off another explosion, which does the job intended.

In the opinion of the witness, in the use of the imported merchandise, the principle employed is that of the cartridge, rather than that of the percussion cap. He said, however, that the item could be used as

a percussion cap to explode a larger charge, or it could be used to force a projectile as a cartridge does. Using the item in the chamber of the pistol would serve the same purpose as that of a blank cartridge, to make a noise. With the addition of a projectile, it could be used as a propellant as well.

The witness stated that he based his conclusion that the imported merchandise is a blank cartridge, rather than a percussion cap, upon the principle upon which he had seen it demonstrated and the way it could be improvised to make it into a complete cartridge by the addition of a projectile the same size as the bore.

The issue before the court is whether the imported articles are percussion caps or cartridges. Since the provisions for these articles in paragraph 1517 and said paragraph, as modified, are *eo nomine* designations, the primary question is whether the merchandise is, in fact, one or the other.

According to the record herein, a percussion cap is a little metal cap or cup containing fulminating powder. A complete cartridge, on the other hand, contains a primer or percussion cap, a propellant charge of black powder or smokeless powder, and a projectile. A blank cartridge differs only in that it does not contain a projectile. It is evident, therefore, that a percussion cap and a cartridge are different in construction and contents. As used today, a percussion cap is part of a cartridge, although in older guns it was attached to the gun.

The percussion cap was invented and used as a means of firing a charge before the invention of the cartridge. See *The Development of Small Arms*, Encyclopaedia Britannica, volume 20, pages 802, ff.; *Firearms*, Collier's Encyclopedia, volume 8, pages 59, ff. Percussion powder was patented in 1807 by Alexander Forsyth, a Scottish clergyman, and was used to ignite a propellant charge. The percussion cap itself was invented about 1816. That article resembled a top hat, the bottom of its cavity containing a minute amount of percussion mixture held in place by a disk of tinfoil. This was placed on a pierced tube or nipple at the breech of the gun and struck by a moving member called the hammer. The resultant explosion sent a flash through the tube to the propellant charge of powder. Subsequently, about 1846, the metallic cartridge was invented. The case of that device was of copper or brass. Concealed within it at its base was a small percussion cap. It brought together within a single unit the powder charge filling the case from cap to base of bullet, a priming element (the cap), and a projectile.

Percussion caps are described in the Summaries of Tariff Information, 1948, volume 15, part 2, page 63, as follows:

Percussion caps are small metal cups containing a high explosive material. In earlier days they were used to fire breech-loading and muzzle-loading guns. In

cartridges they are inserted in the base of the cartridge shell, where they are struck by the firing pin, in order to detonate the powder charge in the cartridge. The percussion cap used as a part of the cartridge is today designated a "primer." Although millions of these primers are made, comparatively few are sold as such; manufacturers of cartridges make the primers for them.

Another authority gives the following definitions (Webster's New International Dictionary, 1953 edition):

cartridge, * * * A case, capsule, shell, or bag of metal, pasteboard, or other material, holding a complete charge for a firearm, in small arms and some cannon containing also the projectile; also, a case containing an explosive charge to be fired by concussion, electricity, etc.

blank cartridge. A cartridge having, in place of a projectile, a paper cup or wadding in the mouth of the case.

percussion cap. *Firearms.* A small metallic cap or cup, containing fulminating powder, used with a percussion lock.

A similar definition of percussion cap was noted in *G. W. Sheldon & Co.* v. *United States,* T. D. 14407, G. A. 2291, as follows:

Lexicographers define a percussion cap as "a small detonating copper cap used with a percussion lock for exploding the charge of a firearm." This appears also to be the commercial and popular understanding of the term.

It is evident from the record and the authorities that the instant merchandise conforms to the description of a percussion cap, rather than that of a cartridge. It is constructed in the same way as a percussion cap; it contains fulminating powder; when struck, the powder explodes and flame is emitted. A cartridge, on the other hand, contains gunpowder or smokeless powder and cannot be set off by a blow.

Defendant's claim is based primarily on the fact that, as used in the miniature pistol, the merchandise did not set off a propellant charge, so that its use was like that of a blank cartridge, merely to make a noise.

The statutory provisions for percussion cap and cartridges are *eo nomine* designations, clear and unambiguous. There is no suggestion that the element of use is a criterion in classifying merchandise thereunder. *Cf. F. W. Myers & Co., Inc.* v. *United States,* 24 Cust. Ct. 178, 184–185, C. D. 1228. Furthermore, we note that defendant's witness admitted that the imported article could be used as a percussion cap to explode a larger charge. Plaintiff's witness Williams pointed out that, although a pin or toothpick could be shot from the pistol with the use of this merchandise, not enough pressure would be generated to shoot the projectile through even a piece of paper. In our view, such use is not similar to that of a cartridge.

Defendant's claim that the collector's classification should be sustained, by virtue of the similitude clause in paragraph 1559, is not tenable, since that clause comes into effect only where the articles are not provided for under any paragraph of the tariff act. *Package Machinery Co.* v. *United States,* 41 C. C. P. A. (Customs) 63, C. A. D.

530.   Since the merchandise herein is, in fact, a percussion cap, an enumerated article, it cannot be classified as something else, even though used as such.

Defendant also contends that, since the articles were invoiced as toy blank cartridges, the plaintiff is estopped to deny the correctness of the invoice upon which entry was made.   Since the invoices were not offered or received in evidence, they may not be considered as proof of the matters recited therein.   *W. T. Grant Company* v. *United States*, 38 C. C. P. A. (Customs) 57, C. A. D. 440.   Moreover, while statements in invoices may be admissions against interest, they establish no more than a *prima facie* case against any contradictory claim made by the plaintiff.   They do not act as an estoppel nor preclude the parties from showing the true character of the merchandise. *United States* v. *Paul Puttmann*, 21 C. C. P. A. (Customs) 135, T. D. 46466; *United States* v. *Wo Kee & Co.*, 21 C. C. P. A. (Customs) 341, T. D. 46880; *United States* v. *Rotberg & Krieger*, 24 C. C. P. A. (Customs) 441, T. D. 48902.

For the reasons stated, we hold that the merchandise is properly dutiable at 15 per centum ad valorem under paragraph 1517 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T. D. 52739, as percussion caps. The protest is sustained and judgment will be rendered in favor of the plaintiff.